## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## (CAMDEN VICINAGE)

**WEISBERG LAW, P.C.**
MATTHEW B. WEISBERG
7 SOUTH MORTON AVE.
MORTON, PA  19070
610-690-0801

| | |
|---|---|
| Jeri Rizzo<br>7 Davis Drive<br>Bridgeton, NJ 08302<br><br>v.<br><br>Anthony James Demarco, III, Individually and<br>D/B/A Demarco REI, Inc.<br>Register #66840-066<br>FDC PHILADELPHIA<br>Federal Detention Center<br>P.O. BOX 562<br>Philadelphia, PA  19105<br><br>Kristin A. Miller<br>Powers Kirn, LLC<br>728 Marne Highway, Suite 200<br>Moorestown, NJ 08070<br><br>Donna L. Feltman<br>321 Cypress Ave<br>Woodlynne, NJ 08107-2113<br><br>William M.E. Powers, Jr.<br>728 Marne Highway, Suite 200<br>Moorestown, NJ 08070<br><br>Marty Bronfman<br>9 Sylvan Way<br>Parsippany, NJ 07054<br><br>Flagstar Bank;<br>5151 Corporate Drive<br>Troy, MI 48098<br><br>Lori Palka<br>8512 Trumbauer Dr.<br>Glenside, PA 19038<br><br>John Does 1-10,<br>          Defendants. | CIVIL ACTION NO.: 09-01453<br><br>JURY OF TWELVE (12) JURORS<br>DEMANDED |

## FOURTH AMENDED CIVIL ACTION COMPLAINT

**I.    Preliminary Statement**

1.    This is an action for an award of attorney's fees and costs, compensatory, statutory, treble and punitive damages, also seeking equitable, injunctive and other relief, for Defendants' "Foreclosure Rescue Scam," deed conversion, unfair or deceptive acts and practices ("UDAP"), conspiracy and/or aiding and abetting same.

**II.    Jurisdiction and Venue**

2.    Jurisdiction in this Honorable Court is based on federal question conferred by 28 U.S.C. §1331; supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

3.    Venue lies in this District in that the events giving rise to this claim occurred here, at least one (1) Defendant resides, maintains a principle place of business, and/or does business here, and/or the subject of this action is situated within this district.

**III.    Parties**

4.    Plaintiff, Jeri Rizzo ("Plaintiff"), is an adult individual, currently residing and/or at all times material were residing at the above-captioned address (referred to hereinafter as "Premises" or "property").

5.    Defendant, Anthony J. DeMarco, III, operated a business entity by the name DeMarco REI, Inc., and, in December, 2010 was indicted by the US Attorney's Office for various fraud and money laundering crimes related to the foreclosure rescue schemes of Demarco REI of which plaintiff was a victim as described herein.

6.    Upon information and belief, DeMarco REI, was nothing more than an alter ego

2

of DeMarco over which debtor exercised complete dominion and control as a vehicle for DeMarco and his accomplices to deceive unsuspecting and desperate consumers into selling their homes under the pretext of "foreclosure rescue". The scheme involved promising foreclosure rescue to save a consumer's home from foreclosure by selling the home to a third party investor under a leaseback agreement, promising credit repair services to qualify the consumer for financing to repurchase their home, promising to protect/escrow equity in the home above pre-existing liens on the home, and then by various pretexts stealing the home equity as cash proceeds from the loan.

7.      Defendant, Lori Palka ("Palka"), is an adult individual and citizen believed residing at the above captioned address who at all times material herein acted as a straw buyer of plaintiffs' property in exchange for a cash payment from DeMarco or DeMarco REI, Inc. from the proceeds of plaintiffs' home equity stolen by Demarco in the transaction described hereinafter.

8.      Defendant, Flagstar Bank, FBS ("Flagstar"), is a duly incorporated entity under and by virtue of the laws of the State of Michigan, maintaining a principle place of business at the above captioned address, at all times material acting as Plaintiff's implied lender.

9.      Garden State Land Title, LLC (hereinafter "GSL") is a New Jersey title insurance agency, now defunct, which served as settlement agent and issued the title insurance in connection with the transaction which is the subject of this complaint.

10.     Defendant William Powers, Jr. ("Powers" or "Closing Attorney") is an owner/member of GSL and attorney licensed in the State of New Jersey to practice law and does so practice law at the firm of Powers Kirn LLC.  Powers lives at 416 Park Lane, Moorestown, New Jersey 08057.

3

11.     Upon information and belief and as described herein, GSL was nothing more than an alter ego of Powers over which he exercised complete dominion and control as a vehicle for he and DeMarco to conspire gain fees and other compensation from dozens of DeMarco REI related transactions in which GSL would represent to the straw buyer's lender that funds due "sellers" like plaintiff on the loan paperwork were, in fact, being distributed by GSL directly to DeMarco at Powers direction.

12.     Kristin A. Miller ("Miller") is an individual currently employed by Powers Kirn and formerly employed by GSL whose residence address is 355 Lake Ave, Colonia, NJ 07067-1216.

13.     Donna L. Feltman ("Feltman") is an individual believed to be employed by Powers and/or Powers Kirn, LLC, and/or GSL whose residence address is 321 Cypress Ave., Woodlynne, NJ 08107-2113.

14.     Upon information and belief, Miller was GSL's primary closing agent for Demarco related loan closings and is involved as the closing agent in other pending litigation, Shellhorn v. Demarco et al., USED Pa. Bkrcy. Adv. 10-446, Scott v. Demarco, D.N.J. 10-3822.

15.     Upon information and belief, Miller acted at all times herein at the training and direction of her employer at GSL, defendant Powers.

16.     Defendant Marty Bronfman ("Bronfman") was an employee of now defunct correspondent lender/broker of the Flagstar loan transaction disputed herein, The Mortgage Store, Inc. (now defunct), and is employed at American Financial Resources at 9 Sylvan Way, Rockaway, NJ 07866.

4

17.     Defendants, John Does 1-10, at all times material were and/or are agents, servants, work persons, employees and/or affiliates of the above defendants and/or are liable hereunder.

## IV.     Operative Facts

### A.     Background

18.     Plaintiff is a single mother raising three children, all living in the premises.

19.     In or around January 2008, Plaintiff was dismissed from her Chapter 13 Bankruptcy, (which case was later reinstated in or around May 27, 2008).  Bankr.D.N.J. 05-36373.

20.     Despite being employed, Plaintiff had fallen behind in the bankruptcy plan payments due to her not receiving (delinquent) child support payments.

21.     At or around that time, Plaintiff was contacted by an individual, Defendant, John Doe, believed named Joe, an employee of Defendant, DeMarco, about helping Plaintiff keep her home and fix her credit so to avoid its ultimate loss due to her default via a foreclosure bailout loan brokered by DeMarco.

### B.     Setup of the DeMarco Scam

20.     Joe advised Plaintiff that he had gotten her name from J.P Morgan Chase ("Chase") (non-party), Plaintiff's then Mortgage Company.

21.     Upon information and belief, Joe stated that he had received her (and her ex-husband's-see below) information from Chase to make Plaintiff believe that DeMarco and Chase were somehow related or that Chase approved of DeMarco's actions as a means to authenticate DeMarco's offer.

22.     Joe advised Plaintiff that, for a fee of approximately $8,000.00 to $10,000.00, DeMarco would repair Plaintiff's credit and help her stay in her home via a form of foreclosure bailout refinance loan.

23.     Plaintiff initially declined DeMarco's offer.

24.     Approximately one week later, Plaintiff received a phone call from her ex-husband, Frank Gottardi (non-party) ("Gottardi"), stating that he had received the same phone call from Joe.

25.     At all times material, Gottardi and Plaintiff were both named on the title to the Premises.

26.     While speaking to Gottardi, Joe, again, stated that he had received Plaintiff's and Gottardi's information from Chase.

27.     Plaintiff relented to Demarco's solicitation.

C.      The Pitch

28.     On or about January 14, 2008, Joe came to Plaintiff's home with his supervisor, Defendant, John Doe, believed to be employee and indicted co-conspirator of DeMarco, Michael Richard Roberts, to discuss Plaintiff's monthly payments and the amount of her debts vis-à-vis this foreclosure rescue loan.

29.     Plaintiff advised Mike that the most she could make in monthly payments was $1,400.00 and that her debt totaled approximately $40,000.00.

30.     On or about January 28, 2008, Defendant, John Doe, an appraiser, valued Plaintiff's home at approximately $210,000.00.

6

31.     Upon information and belief, the appraiser acted at the direction of DeMarco to over-appraise the value of the premises.

32.     Gottardi refused to participate (sign any paperwork or attend closing) as he was not interested in taking out a new loan on the premises.

33.     Joe advised Plaintiff that Gottardi's presence was not necessary; DeMarco would instead provide just Plaintiff with the loan.

34.     In or around March 28, 2008, DeMarco informed Plaintiff that her new monthly payments would be $1,700.00.

35.     Plaintiff informed Mike that the payments were too high and unaffordable and Plaintiff declined to pay an amount she would not be able to afford long-term it.

36.     Mike agreed to lower the payments to $1,400.00 in exchange for DeMarco instead only providing $20,000.00 to partially pay off Plaintiff's debts.

37.     Plaintiff agreed to those terms as it allowed Plaintiff to save her home from Chase's impending Sheriff's foreclosure Sale.


D.     The Closing

38.     On or about April 10, 2008, Mike came to Plaintiff's home for the closing.

39.     The paperwork that Mike brought with him indicated the originally discussed $1,700.00 payment obligation, directly contradicting the amount Plaintiff had agreed to and Mike had promised ($1,400).

40.     As time was of the essence per the imminent foreclosure sale, Mike informed Plaintiff that she should sign the documents as they were and that he would change the terms to $1,400.00 when he got back to his office.

41. Plaintiff was reluctant to sign those documents, but Mike coerced Plaintiff to sign using the imminent foreclosure by Chase as duress.

42. Among the documents brought by Mike that plaintiff signed was a deed prepared by Powers and signed by Plaintiff which purported to transfer the property to defendant straw buyer, Lori Palka.

43. Powers and DeMarco intentionally withheld from Plaintiff copies of the loan paperwork at closing under the guise of Mike stating that he needed all the documents in order to change the monthly payment amount to the proper amount of $1,400.00.

44. Mike took all the paperwork with him and told Plaintiff that he would overnight the corrected paperwork to Plaintiff, which she never received.

45. When Plaintiff did not receive the paperwork, she called DeMarco and spoke with Joe.

46. Joe informed Plaintiff that Mike did not change the paperwork to reflect $1,400.00 but rather that the "correct" figure was $1,700.00.

47. Plaintiff disputed this and demanded a copy of the paperwork, to no avail.

48. Plaintiff was never sent closing loan paperwork prior to filing of this action despite repeated requests to Demarco and other parties.


E. The "Rescue" Loan's Irregularities

49. Upon information and belief, after the closing Mike and/or DeMarco delivered the closing paperwork to Powers who then ordered the deed and mortgage documents notarized by defendant Feltman out of the presence of plaintiff.

8

50.     The HUD1 delivered by defendant Miller to Flagstar contained the signatures of defendants Miller, as closing agent, and, without any apparent requirement of the document itself, defendant Feltman's signature and notary stamp.

51.     Plaintiff never met either defendants Miller, Feltman, or Powers.

52.     The aforesaid HUD1 reflected $101,944 cash proceeds being paid to Plaintiff from the loan proceeds.

53.     In addition to the foregoing, Flagstar's origination, underwriting, and claim files for this disputed loan contains the following irregularities:

a.     Defendant Palka signed a loan application dated 3/10/08 and prepared by Bronfman and Flagstar indicating she was purchasing plaintiff's property as a primary residence whereas the second 4/10/08 application indicates its purchase as a secondary residence;

b.     The "Contract for Sale" indicates in clause 3 that it is a cash deal and there is no mortgage contingency clause despite the fact that it was then purchased almost wholly with financing;

c.     In an audit of the loan file, Flagstar acquired from 's escrow bank, Wachovia, copies of all disbursement checks except the $84,944.70 disbursement to DeMarco or Demarco REI;

d.     Flagstar made a private mortgage insurance claim on the Palka loan with MGIC after Palka defaulted, but the claim was denied by MGIC due to fraud involving; 1) Excessive income (Flagstar underwriter failed to assess Palka's 9 month teacher's income as a twelve (12) month salary); 2) failure to confirm

9

$7,000 borrower down money for closing costs; 3) Falsified DTI (debt to income) for Palka to qualify the loan without supporting documentation.

54.     Upon information and belief, Flagstar acted with intent to defraud or with reckless disregard of the truth of its actions knowing that it was selling the loan off to Fannie Mae with the expectation of offloading the loan's performance risk thereby and reaping short term profits without regard to future consequences of its actions.

F.     Discovery of other Post-Sale Facts

55.     After the closing, Plaintiff began to receive strange demands for rent from DeMarco.

56.     There was no intended rental agreement with DeMarco; plaintiff did not intend to sell her home.

57.     Plaintiff only later discovered that defendants Powers, Miller, Feltman, and , in conspiracy with DeMarco, fraudulently conveyed title to defendant Palka without plaintiff's permission.

58.     On or about June 20, 2008, Plaintiff learned of her "sale" through an announcement in a local newspaper which stated that Plaintiff's property had been sold to Palka on or around April 14, 2008.  Plaintiff understood thereafter that Palka and Demarco coordinated a scheme whereby DeMarco solicited Plaintiff not for a mortgage foreclosure bailout via refinance but ultimately rather a "sale lease-back" of Plaintiff's premises to Palka, all concealed from Plaintiff.

59.     Powers directed Miller to release loan funds at closing to DeMarco that it knew or should have known were neither bona fide services rendered to Plaintiff nor services agreed to by Plaintiff.

60.     Miller and  prepared at Powers' direction a HUD1 statement indicating that Palka provided a down payment of $28,785.18 in connection with the transaction that it knew or should have known was not true because, upon information and belief, the said funds were, in fact, deposited into 's escrow account by DeMarco.

61.     Plaintiff received $17,000 from the transaction, still in an escrow account, but did not receive credit repair services from NuCredit, Demarco, or any other party.

62.     Powers prepared a deed transferring the property from plaintiff to straw buyer Palka.

63.     Powers delivered the deed to Demarco and/or his employees, one of which employees in turn delivered the deed and Flagstar mortgage to his mother, defendant Feltman, who notarized the deed and mortgage out of the presence of plaintiff in her office where she worked.

64.     Plaintiffs, having no knowledge or sophistication in financial transactions, relied upon the representations of Demarco and his agents, Miller, and Powers.

65.     Upon information and belief and in keeping with facts learned in other litigations concerning Demarco and Demarco REI, Palka was paid a lump sum of money from plaintiffs' equity to act as a straw buyer of plaintiffs' property to facilitate a foreclosure rescue rather than purchase plaintiffs' home for occupancy or investment.

66.     Upon information and belief, Powers and Miller disbursed, as was agreed between defendants but concealed from Plaintiff, the proceeds from the closing derived from the Flagstar loan to:

    a.     itself via inflated (purchase and not refinance) title insurance and endorsements premiums, along with related closing fees (such as courier, wire, document preparation, notary, etc) which were not incurred and were not customary;

    b.     Flagstar via pre-paid finance charges;

    c.     DeMarco and Palka via the difference between the Flagstar purchase amount and the Chase pay-off (equity); and

    d.     DeMarco via the Yield Spread Premium (difference between the available interest rate and ultimate closing rate reduced to a monetary sum in the form of a commission).

    e.     Additionally, Palka and DeMarco would profit in sharing the anticipated rents from plaintiff (wherein Plaintiff was intended by Defendants to rent the premises ultimately towards repurchase);

67.     The Flagstar mortgage is, in fact, plaintiff's refinance mortgage and Plaintiff is the implied borrower of Palka's purchase loan made by Flagstar brokered through Bronfman and DeMarco wherein the loan refinanced and paid off Plaintiff's debt, but plaintiff retained all indicia of homeownership, and Plaintiff funded by her equity Defendants' disbursement and splitting of the loan proceeds.

68.     As otherwise required, Flagstar through Garden State failed to provide Plaintiff with the loan documentation furthering the concealed deed, equity and settlement proceeds conversion.

69.     At all times, Defendant DeMarco acted with full authority as an agent of co-Defendants with co-Defendants' actual if not constructive knowledge towards the aforesaid joint venture.

70.     In or around, April 2009, defendant, Flagstar, though Mortgage Electronic Registration Systems, Inc ("MERS") (non-party), instituted foreclosure against Plaintiff's property arising from Palka's alleged loan default.

## V.      Causes of Action

### COUNT I – Equitable Relief
*Plaintiff v. Flagstar*

71.     Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

72.     The deed and mortgage have not been validly notarized by defendant Feltman pursuant to state law, N.J. Rev. Stat. § 17:11C-1 et seq., is *void ab initio*.

73.     Plaintiff is entitled to equitable reformation of the deed returning title to her and also entitled to equitable reformation of the mortgage loan with a reduced principal recognizing only benefit of debts satisfied and affordable monthly payment terms.

74.     In the alternative, plaintiff alleges the sale/leaseback transaction was fraudulent and Palka and Flagstar knew or should have known same based on facts alleged herein including but not limited to the following facts:

a.   Plaintiff's existing mortgage loan was delinquent and in foreclosure status at the time of the disputed loan's origination;

b.   Plaintiff continued to occupy the property proceeding the sale;

c.   There was no prior listing of the property or involvement of a real estate agent in the sale;

d.   There was contradictory information and otherwise no credible factual basis in the loan file to support Palka buying another home in a suburban neighborhood sixty (60) miles away as a secondary residence;

e.   Other indicia of fraud identified by MGIC who denied Flagstar's insurance claim based thereon.

75.    The aforesaid facts giving Flagstar notice set forth above or the principals of equity alone create a deed equitably vested back in plaintiff and an equitable mortgage in favor of Flagstar for benefit recognized to plaintiff only.

## COUNT II
## Truth-in-Lending Act ("TILA")/Home Ownership and Equity Protection Act ("HOEPA")
### *Plaintiff v. Flagstar*

76.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

77.    Plaintiff is a natural person provided with the right to defer payment of debts or to incur payment of debt and defer payment, and the credit offered or extended was primarily for personal, family and/or household purposes.

78.    Defendants regularly extend consumer credit, six (6) or more loans per year, two (2) or more high cost mortgages per year, and/or one (1) or more of such high cost mortgages through a broker.

79.    This loan was a federally related mortgage loan, made by a federally-insured depository lender, is HUD-related, and/or was intended to be sold on the secondary market or to creditors who make or invest more than one million dollars a year in residentially secured loans.

80.    At all times material, Defendants, in the ordinary course of business, extended and/or arranged for the extension of consumer credit and/or offered to extend or arrange for the extension of such credit.

81.    The Loan was a residential refinance mortgage loan subject to Plaintiff's right of rescission, recoupment, statutory and/or actual damages described by 15 U.S.C. §1635 and 12 C.F.R. §226.23.

82.    In said loan transaction, Plaintiff did not receive the disclosures required by the Truth-In-Lending Act ("TILA"), 15 U.S.C. §1601, et. seq., and Regulation Z of the Federal Reserve Board ("Regulation Z"), 12 C.F.R §226.1 et seq.

83.    Defendant Flagstar knew or should have known Plaintiff to be an implied-in-fact borrower.

84.    Defendants failed to deliver all "material" disclosures required by TILA and Regulation Z, including but not limited to:

> (a) Failing to properly and accurately disclose the "amount financed," described in and in violation of Regulation Z §226.18(b) and 15 U.S.C. §1638(a)(2)(A);
>
> (b) Failing to clearly and accurately disclose the "finance charge," described in and in violation of Regulation Z §226.4 and 15 U.S.C. §1638(a)(3);
>
> (c) Failing to clearly and accurately disclose the "annual percentage rate," described in and in violation of Regular Z §226.18(e) and 15 U.S.C. §1638(a)(4);

(d) Failing to comply with the special disclosure requirements of Regulation Z §226.32;

(e) Failing to timely provide Plaintiff with two (2) copies of a Notice of her Right to Rescind the Transaction and/or one (1) copy each of the form Disclosure pursuant to TILA and/or HOEPA.

85.     Due to the violations of TILA and Regulation Z, Plaintiff has an ongoing right to rescind the transaction, and/or right to statutory and actual damages.

86.     Plaintiff either has previously rescinded the loan greater than twenty days prior to the filing of this complaint and Defendant has taken no action to rescind the loan in contravention of its responsibilities under TILA, or, to the extent this Honorable Court may find that Plaintiff has not already rescinded the loan, Plaintiff does hereby exercise her right to rescind same and this Complaint shall hereby constitute Plaintiff's Notice of Rescission pursuant to TILA, 15 U.S.C. §1601, et seq.

## COUNT III
### Real Estate Settlement Procedures Act ("RESPA")
*Flagstar, Powers, Miller, and Feltman*

87.     Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

88.     Defendants' violated RESPA, 12 U.S.C. §2607(a) & (b), and Regulation X, by:

a.      receiving payment from DeMarco from the proceeds of the Flagstar loan pursuant to an agreement between DeMarco and Defendants for the purpose of referring settlement business culminating in the instant closing;

b.      splitting the aforesaid unearned, non-incurred and non-customary, pre-paid finance charges derived from the Flagstar loan paid by Flagstar and disbursed by Garden State to Garden State, Flagstar and DeMarco;

16

c.       splitting payment from Flagstar to DeMarco despite DeMarco not providing reasonably related goods and services of equivocal value and, in fact, DeMarco providing no goods or services of any value; and

d.       Defendants requiring Plaintiff's use of Garden State for the closing.

**COUNT IV**
**New Jersey Consumer Fraud Act (CFA)**
*All Defendants*

89.       Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

90.       Defendants, by their actions described engaged in unconscionable commercial practices, deception, fraud including but not limited to:

a.       Flagstar knowingly misrepresented the loan the loan transaction to Plaintiff as a conventional sale when it knew or should have known the transaction involved a sale/leaseback transaction between DeMarco/DeMarco REI and Plaintiff or acted with reckless disregard of any duty of due diligence that would have revealed the transaction's illegal nature had the loan's irregularities, as described above, been recognized or not contributed to by Flagstar's own actions;

b.       Powers, Miller, and Feltman, by their actions described aforesaid illegally created, notarized and filed deed and mortgage documents and alternatively, or in addition, said Defendants engaged in acts of omission, including but not limited to knowing concealment, suppression and omissions of material facts in connection with the diversion of funds from the mortgage transaction to DeMarco.

17

c.      Bronfman knew that he was not engaging in lawful brokering of a purchase mortgage insofar as Bronfman knew Palka was only a straw buyer, that Demarco provided all loan application information to Bronfman to qualify Palka for the mortgage, that Demarco was arranging the transaction to steal the home's equity from Rizzo and concealed the facts that Palka did not have funds for the down payment to complete the sales transaction.

91.     Said Defendants intended for Ms. Rizzo to rely on the defendants' aforementioned acts creating the appearance of a lawful real estate and loan transaction when such acts in fact involved unconscionable commercial practices, deception, fraud, false pretense, false promise and misrepresentation, and Ms. Rizzo did rely on same.

92.     The foregoing acts by Defendants constitute violations of New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-2 at seq., as a result of which Ms. Rizzo suffered ascertainable loss of over $100,000 in stolen loan funds.

**COUNT V – PROFESSIONAL NEGLIGENCE**
**(Closing Attorney)**

93.     Plaintiff repeats the above allegations as if set forth herein at length.

94.     Closing Attorney  owed a duty of care to plaintiff.

95.     As part of the closing scheduled in connection with the real estate sale set forth in this complaint, Closing Attorney was employed to prepare a deed of conveyance from Plaintiff and a HUD-1 for the transaction as set forth above.

96.     Such employment was not at the written request of the Plaintiff.

97.     DeMarco directed the service of deed preparation to Closing Attorney.

98.     By preparing a deed for the plaintiff as seller, Closing Attorney was representing the Plaintiff in connection with the transaction.

99.     By accepting the task of preparing the deeds, Closing Attorney was obligated to represent the interests of his client, the plaintiff seller in the transaction, in the same manner as he is required to represent the interests of other clients.

100.    Despite the fact that Closing Attorney was obligated to represent and protect the interests of the Plaintiff, defendant failed to do so.

101.    Neither Closing Attorney nor any agent, servant, or representative of his including, but not limited to Miller, ever contacted or personally consulted with the Plaintiff concerning the real estate transaction nor provided any disclosure to Plaintiff concerning Powers' connection to or employment with Demarco or Demarco REI.

102.    The employment of Closing Attorney as well as Closing Attorney's relationship with DeMarco and DeMarco REI placed Closing Attorney in an untenable conflict of interest, by virtue of which Closing Attorney could not ethically or professionally represent the Plaintiff's interests as Seller.

103.    Indeed, Closing Attorney was simultaneously serving two masters, i.e. the Plaintiff and DeMarco/DeMarco REI, with wholly divergent and different goals.

104.    DeMarco's goal was to conceal his theft of seller's funds due plaintiff on the HUD1 closing statement and other documents while the goal of the Plaintiff was to ensure that her rights were protected in the real estate closing, even if that meant that the closing should not go forward at all.

105.    Plaintiff's rights were not protected.

19

106.    By having an interest in collecting his fees paid from the transaction, Closing Attorney had an incentive to ensure the deal closing rather than act in the Plaintiff's best interests as seller.

107.    Plaintiff was deprived of any consultation whatsoever concerning her rights, responsibilities and liabilities concerning the entire transaction, despite Closing Attorney's representation of her interests.

108.    The dual responsibilities of Closing Attorney constituted a breach of his duty of loyalty to the Plaintiff as her attorney.

109.    Closing Attorney had a duty to place the client's best interests first and to provide the client with independent professional judgment.

110.    Closing Attorney breached that duty by putting the interests of DeMarco and DeMarco REI ahead of plaintiff's interests by, among other things;

a.    Creating documents to make it appear that Plaintiff was selling her home when he knew or should have known that DeMarco had represented that the transaction was a kind of mortgage that would enable Plaintiff to save her home;

b.    Failing to provide Plaintiff with sound legal advice about the significance of transferring the deed to her property to someone else;

c.    Failing to explain the risks and dangers associated with the transaction;

d.    Preparing and witnessing a settlement statement that contained false statement including but not limited to the existence of a substantial down payment and the disbursement of sale proceeds to seller which defendant knew was being disbursed by him to DeMarco;

e.    Failing to supervise the disbursement of funds from the loan closing;

20

    f.   Filing documents such as the deed and mortgage with the Plaintiff's signature forged thereto; and

    g.   Obscuring the nature of the loan transaction that they closed by, among, other acts, lying about Demarco's fees being paid for actual services rendered to plaintiff.

102.    As a result of Defendant's breach of their duty, Plaintiff suffered damage.

**<u>COUNT VI</u> - Breach of Contract**
*Closing Attorney*

103.    Plaintiff repeats the above allegations as if set forth herein at length.

104.    Plaintiff and Defendant Powers entered into a contract, for legal services which is either implied or in the exclusive possession of Closing Attorney.

105.    Plaintiff and Defendant, Closing Attorney, executed a fee agreement and/or entered into a mutual understanding, express or implied, or as a matter of law, towards Defendants' representation of Plaintiff in the underlying sale transaction.

106.    Whether express, implied, or as a matter of law, Defendant Powers breached that agreement/understanding as aforesaid (incorporated by reference).

107.    As a direct and proximate cause of the aforementioned breach of the agreement to provide legal services, Plaintiff has been damaged, as set forth above.


**VI.    Prayer for Relief**

**WHEREFORE**, Plaintiff requests this Honorable Court enter judgment in her favor and against Defendants, individually, jointly and/or severally, in an amount in excess of seventy-five thousand dollars ($75,000), plus such other and further relief as this Honorable Court deems necessary and just, and to Order the following relief:

21

a. Termination of any security interest in Plaintiff's property which may have been created under the loan in favor of Palka;

b. Equitable reformation of the Flagstar loan obligation;
c. Return of any money or property given by Plaintiff to anyone, including Defendants, in connection with the transaction;

d. Statutory damages;

e. Forfeiture and return of loan proceeds representing cashed out home equity stolen from plaintiff;

f. Damages, including;
   i. Actual damages;
   ii. Treble damages;
   iii. Attorneys fees and expenses, and costs of suit; and
   iv. Punitive Damages.

WEISBERG LAW, P.C.


/s/ Matthew B. Weisberg_____
MATTHEW B. WEISBERG, ESQUIRE
Attorney for Plaintiff

Dated: 9/16/11

22