# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### (CAMDEN VICINAGE)

**WEISBERG LAW, P.C.**
MATTHEW B. WEISBERG
7 SOUTH MORTON AVE.
MORTON, PA  19070
610-690-0801

| | |
|---|---|
| Jeri Rizzo<br>7 Davis Drive<br>Bridgeton, NJ 08302<br><br>v.<br><br>Anthony James Demarco, III, Individually and<br>D/B/A Demarco REI, Inc.<br>Register #66840-066<br>FDC PHILADELPHIA<br>Federal Detention Center<br>P.O. BOX 562<br>Philadelphia, PA  19105<br><br>Kristin A. Miller<br>19 Madison Ave.<br>Cherry Hill, NJ 08002<br><br>Donna L. Feltman<br>321 Cypress Ave<br>Woodlynne, NJ 08107-2113<br><br>William M.E. Powers, Jr.<br>728 Marne Highway, Suite 200<br>Moorestown, NJ 08070<br><br>Flagstar Bank<br>5151 Corporate Drive<br>Troy, MI 48098<br><br>Lori Palka<br>8512 Trumbauer Dr.<br>Glenside, PA 19038<br><br>John Does 1-10,<br>          Defendants. | CIVIL ACTION NO.: 09-01453<br><br>JURY OF TWELVE (12) JURORS DEMANDED |

## FIFTH AMENDED CIVIL ACTION COMPLAINT

**I.      Preliminary Statement**

1.      This is an action for an award of attorney's fees and costs, compensatory, statutory, treble and punitive damages, also seeking equitable, injunctive and other relief, for Defendants' "Foreclosure Rescue Scam," deed conversion, unfair or deceptive acts and practices ("UDAP"), conspiracy and/or aiding and abetting same.

**II.     Jurisdiction and Venue**

2.      Jurisdiction in this Honorable Court is based on federal question conferred by 28 U.S.C. §1331; supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

3.      Venue lies in this District in that the events giving rise to this claim occurred here, at least one (1) Defendant resides, maintains a principle place of business, and/or does business here, and/or the subject of this action is situated within this district.

**III.    Parties**

4.      Plaintiff, Jeri Rizzo, is an adult individual, currently residing and/or at all times material were residing at the above-captioned address (referred to hereinafter as "premises" or "property").

5.      Defendant, Anthony J. DeMarco, III, operated a business entity by the name DeMarco REI, Inc., and, in December, 2010 was indicted by the US Attorney's Office for various fraud and money laundering crimes related to the foreclosure rescue schemes of Demarco of which plaintiff was a victim as described herein, USED Pa. No. 10-7242.

6.      Upon information and belief, DeMarco REI, was nothing more than an alter ego of DeMarco over which Demarco exercised complete dominion and control as a vehicle for DeMarco and his accomplices to deceive unsuspecting and desperate consumers into selling their

homes under the pretext of "foreclosure rescue". The scheme involved promising foreclosure rescue to save a consumer's home from foreclosure by selling the home to a third-party investor under a leaseback agreement, promising credit repair services to qualify the consumer for financing to repurchase their home, promising to protect/escrow equity in the home above pre-existing liens on the home, and then by various pretexts stealing the home equity as cash proceeds from the loan.

7.      Defendant, Lori Palka is an adult individual and citizen believed residing at the above captioned address who at all times material herein acted as a straw buyer of plaintiffs' property in exchange for a cash payment from DeMarco or DeMarco REI, Inc. from the proceeds of plaintiffs' home equity stolen by Demarco in the transaction described hereinafter.

8.      Defendant, Flagstar Bank, FBS ("Flagstar"), is a duly incorporated entity under and by virtue of the laws of the State of Michigan, maintaining a principle place of business at the above captioned address, at all times material acting as Plaintiff's implied lender.

9.       Defendant William Powers, Jr. ("Powers" or "Closing Attorney") is an owner/member of Garden State Land Title, LLC or "GSL" (non-party)  and attorney licensed in the State of New Jersey to practice law and does so practice law at the firm of Powers Kirn LLC. Powers lives at 416 Park Lane, Moorestown, New Jersey 08057.

10.      Upon information and belief and as described herein, GSL was nothing more than an alter ego of Powers over which he exercised complete dominion and control as a vehicle for he and DeMarco to conspire gain fees and other compensation from dozens of DeMarco REI related transactions in which GSL, the subject title company, would represent to the straw buyer's lender that funds due  "sellers" like plaintiff on the loan paperwork were, in fact, being distributed by  directly to DeMarco at Powers' direction.

3

11.     Kristin A. Miller ("Miller") is an individual formerly employed by Powers' law firm Powers Kirn and formerly employed by GSL, whose residence address is believed to be 19 Madison Ave., Cherry Hill, NJ 08002.

   a.   Powers and Miller are sometimes collectively referred to herein as "Title Defendants".

12.     Donna L. Feltman is an individual believed to be employed by Powers and/or Powers Kirn, LLC, and/or  whose residence address is 321 Cypress Ave., Woodlynne, NJ 08107-2113.

13.     Upon information and belief, Miller was the primary closing agent for Demarco related loan closings and is involved as the closing agent in other pending litigation, <u>Shellhorn v. Demarco et al.</u>, USED Pa. Bkrcy. Adv. 10-446.

14.     Upon information and belief, Miller acted at all times herein at the training and direction of her employer at GSL, defendant Powers.

15.     Marty Bronfman (non-party) was an employee of now defunct correspondent lender/broker of the Flagstar loan transaction disputed herein, The Mortgage Store, Inc. (now defunct, non-party), and is employed at American Financial Resources at 9 Sylvan Way, Rockaway, NJ 07866.

16.     Defendants, John Does 1-10, at all times material were and/or are agents, servants, work persons, employees and/or affiliates of the above defendants and/or are liable hereunder.


**IV.     Operative Facts**

   **A.     <u>Background</u>**

4

17.     Plaintiff is a single mother raising three children, all living in the premises.

18.     In or around January 2008, Plaintiff was dismissed from her Chapter 13 Bankruptcy, (which case was later reinstated in or around May 27, 2008).  Bankr.D.N.J. 05-36373.

19.     Despite being employed, Plaintiff had fallen behind in the bankruptcy plan payments due to her not receiving (delinquent) child support payments.

20.     At or around that time, Plaintiff was contacted by an individual, Defendant, John Doe, believed named Joe, an employee of Defendant, DeMarco, about helping Plaintiff keep her home and fix her credit so to avoid its ultimate loss due to her default via a foreclosure bailout loan brokered by DeMarco.

### B.        Setup of the DeMarco Scam

20.     Joe advised Plaintiff that he had gotten her name from J.P Morgan Chase ("Chase") (non-party), Plaintiff's then Mortgage Company.

21.     Joe advised Plaintiff that, for a fee of approximately $8,000.00 to $10,000.00, DeMarco would repair Plaintiff's credit and help her stay in her home via a form of foreclosure bailout refinance loan.

22.     Plaintiff initially declined DeMarco's offer.

23.     Approximately one week later, Plaintiff received a phone call from her ex-husband, Frank Gottardi (non-party) ("Gottardi"), stating that he had received the same phone call from Joe.

24.     At all times material, Gottardi and Plaintiff were both named on the title to the Premises.

25.     While speaking to Gottardi, Joe, again, stated that he had received Plaintiff's and Gottardi's information from Chase.

26.     Plaintiff relented to Demarco's solicitation.

**C.      The Pitch**

28.     On or about January 14, 2008, Joe came to Plaintiff's home with his supervisor, Defendant, John Doe, believed to be employee and indicted co-conspirator of DeMarco, Michael Richard Roberts, to discuss Plaintiff's monthly payments and the amount of her debts vis-à-vis this foreclosure rescue loan.

29.     Plaintiff advised Mike that the most she could make in monthly payments was $1,400 and that her debt totaled approximately $40,000.

30.     On or about January 28, 2008, Defendant, John Doe, an appraiser, valued Plaintiff's home at approximately $210,000.

31.     Upon information and belief, the appraiser acted at the direction of DeMarco to over-appraise the value of the premises.

32.     Gottardi refused to participate (sign any paperwork or attend closing) as he was not interested in taking out a new loan on the premises.

33.     Joe  advised Plaintiff that Gottardi's presence was not necessary; DeMarco would instead provide just Plaintiff with the loan.

34.     In or around March 28, 2008, DeMarco informed Plaintiff that her new monthly payments would be $1,700.

35.     Plaintiff informed Mike that the payments were too high and unaffordable and Plaintiff declined to pay an amount she would not be able to afford long-term it.

6

36.     Mike agreed to lower the payments to $1,400 in exchange for DeMarco instead only providing $20,000.00 to partially pay off Plaintiff's debts.

37.     Plaintiff agreed to those terms as it allowed Plaintiff to save her home from Chase's impending Sheriff's foreclosure Sale.

**D.     The Closing**

38.     On or about April 10, 2008, Demarco representative, John Doe, Mike Barber, came to Plaintiff's home to close the loan only with plaintiff.

39.     Upon information and belief, defendant Miller mailed the closing documents to Palka to sign and return.

40.     The aforesaid closing documents included a HUD1 prepared by Miller and/or Powers and loan documents prepared by Flagstar all of which was delivered to Mike by the Title defendants at Demarco's instruction.

41.     The paperwork that Mike Barber brought with him indicated the originally discussed $1,700 0 payment obligation, directly contradicting the amount Plaintiff had agreed to and Mike had promised ($1,400).

42.     Mike informed Plaintiff that she should sign the documents as they were and that he would change the terms to $1,400 when he got back to his office.

43.     Plaintiff was reluctant to sign those documents, but Mike coerced Plaintiff to sign using the pretext that the interest rate on her Chase was going up unless she signed that day.

44.     Among the documents brought by Mike Barber that plaintiff signed was a deed believed prepared by Powers and signed by Plaintiff which purported to transfer the property to defendant straw buyer, Lori Palka.

45.     When plaintiff questioned Palka's name on the closing documents, she was told by Mike and Joe that Palka was head of funding for Demarco REI and not to worry about it.

46.     Mike and Joe otherwise explained that plaintiff's name would still stay on the deed as a matter of record and that Demarco's company would hold the mortgage loan after it paid off the loans held by Chase.

47.     Powers and DeMarco intentionally withheld from Plaintiff copies of the loan paperwork at closing under the guise of Mike stating that he needed all the documents in order to change the monthly payment amount to the promised amount of $1,400.00.

48.     Mike took all the paperwork with him and told Plaintiff that he would overnight the corrected paperwork to Plaintiff.

49.     Upon information and belief, after the closing Mike, Joe, and/or DeMarco delivered the signed closing paperwork to defendant Feltman to notarize the deed and mortgage documents outside the presence of plaintiff or Palka.

50.     The signed closing documents were then delivered to the Title defendants.

51.     The signed HUD1 delivered by defendant Miller to Flagstar contained the signatures of defendants Miller, as closing agent, and defendant Feltman's signature and notary stamp.

52.     Plaintiff never met defendants Miller, Feltman, or Powers.

53.     Palka met neither Miller nor Powers.

54.     The aforesaid HUD1 reflected $101,944 cash proceeds being paid to Plaintiff from the loan proceeds.

55.     Title defendants knew the HUD1 did not describe the real sale-leaseback transaction between plaintiff and Palka given title defendants' closing file containing a lease

8

between plaintiff and Demarco and an option to purchase given by Demarco in favor of plaintiff. (See Lease, Option document, and HUD-1 collectively attached hereto as Ex. A, receipt pending of Powers Deposition Transcript and Exhibits).

  **E.**    **Post –sale Facts**

  56.    When Plaintiff did not receive the paperwork, she called DeMarco and spoke with Joe.

  57.    Joe informed Plaintiff that Mike did not change the paperwork to reflect $1,400.00 but rather that the "correct" figure was $1,700.00.

  58.    Plaintiff disputed this and demanded a copy of the paperwork, to no avail.

  59.    Demarco never sent Plaintiff any closing paperwork except for the HUD1 demanded through counsel shortly after to closing and prior to filing of this action despite repeated requests to Demarco and other parties for such documents.

  60.    After the closing, Plaintiff began to receive demands for rent from DeMarco.

  61.    On or about June 20, 2008, Plaintiff learned of her "sale" of the property through an announcement in a local newspaper that stated Plaintiff's property had been sold to Palka on or around April 14, 2008.

  62.    Plaintiff understood thereafter that Palka, Title Defendants and Demarco had coordinated a scheme whereby DeMarco solicited Plaintiff not for a mortgage foreclosure bailout via refinance but ultimately rather a "sale lease-back" of Plaintiff's premises to Palka, all concealed from Plaintiff.

  63.    Title defendants paid Demarco $85,000 from the sale proceeds listed on the HUD-1 in accordance with a one page document listing that amount payable to Demarco for unspecified "financial services" (Ex. B).

64.     Powers directed and trained Miller to release loan funds at closing to DeMarco for unspecified "financial services" that he knew or should have known were not bona fide services rendered to Plaintiff.

65.     Title defendants knew or should have known that down payment of $28,785.18 the HUD1 reflected from Palka for the transaction was not true because, upon information and belief, the said funds were, in fact, deposited into GSL's escrow account by DeMarco and then paid back to him via the $85,000 check.

66.     Plaintiff received $17,000 from the transaction, still in an escrow account, but did not receive credit repair services from Demarco, or any other party.

67.     Plaintiff, having no knowledge or sophistication in financial transactions, relied upon the representations of Demarco and his agents, Miller, and Powers.

68.     Upon information and belief and in keeping with facts learned in other litigations concerning Demarco and Demarco REI, Palka was paid a lump sum of money from plaintiff's equity to act as a straw buyer of plaintiff's property for Demarco rather than purchase plaintiff's home for occupancy or investment.

69.     In March 2009 upon plaintiff's dispute through counsel to Miller regarding the distribution of sale proceeds, Miller assured Demarco via email that she would not turn over any paperwork to plaintiff concerning the closing without a subpoena.

70.     In or around, April 2009, defendant, Flagstar, though Mortgage Electronic Registration Systems, Inc ("MERS") (non-party), instituted foreclosure against Plaintiff's property arising from Palka's alleged loan default.

71.     At all times herein, Defendant DeMarco acted as principal of his agents, the Title Defendants, with said co-Defendants' actual if not constructive knowledge towards the aforesaid joint venture to strip home equity from financially distressed homeowners.

**F.     Flagstar's Defective Origination of the Loan**

72.     On March 10, 2008 or roughly one (1) month before closing, the loan was first submitted to Flagstar for the purpose of defendant Palka purchasing plaintiff's home as a primary residence.

73.     The loan was denied by Flagstar as a primary home purchase after which it was, strangely, resubmitted as a second home purchase by Palka (see the loan applications for each purpose attached as Ex. C, Flagstar dep. Ex. FS-1).

74.     Flagstar contracted another company, MGIC, to act as its agent for the purpose of underwriting the Palka loan subject to Flagstar's final review and approval.

75.     Flagstar's decision to extend credit to Palka to purchase plaintiff's home was also based on Fannie Mae underwriting guidelines insofar as it was written as a wholesale loan intended to be sold immediately after origination to Fannie Mae.

76.     Fannie Mae underwriting guidelines in their 2007 selling guide define "second home properties" as, among other attributes, the borrower does not rent or give a management firm control over, https://www.efanniemae.com/sf/guides/ssg/index.jsp.

77.     Flagstar's 3/20/08 underwriter notes reflect that the property was to be underwritten as either a second home **or** an investment property. (see "Underwriting Findings", Ex. D, Flagstar Dep. Ex. FS-3).

78.     Flagstar's underwriting guidelines for investment properties are more restrictive than for second homes including but not limited to requiring proof of additional assets and different debt and income ratios.

79.     The home appraisal used by Flagstar listed a $7,000 "seller concession" or credit to the buyer that did not appear on the sale agreement document between plaintiff and Palka (see Appraiser Addendum contrasted with Sale agreement collectively attached as Ex. E, Flagstar dep. Ex. FS-2).

80.     Flagstar's decision to extend credit to Palka to purchase plaintiff's home was performed neither in accordance with Flagstar underwriting guidelines nor in accordance with Fannie Mae's selling guide applicable in April, 2008, in that the underwriter ultimately treated the Palka loan submission arbitrarily as a second home contrary to indicia in the underwriting of an investment property purpose never further vetted or explained as to why more restrictive investment property underwriting standards were not applied.

81.     Flagstar's underwriters failed to flag the MGIC underwriter's mistakes in the final loan approval including but limited to:

    a.      Failure to question occupancy of the home when the application was resubmitted for Palka as a second home changing the initial submission's loan purpose weeks earlier of a primary residence;

    b.      Failure to inquire as to why the $7,000 seller concession was missing from the sale agreement.

**G.      Facts Supporting Title Defendants as Agents of Flagstar**

82.     Title defendants were at all times agents of Flagstar, their principal in that Flagstar manifested, by its express instructions to Flagstar as its agent, assent to Miller and  GSL

12

acting on its behalf and subject to the principal's control, and Miller on behalf of GSL consented to so act for Flagstar (see Flagstar "Notice to Settlement Agent", Ex. F).

      **H.**    **Facts Regarding Equitable Mortgage Analysis**

83.    Title defendants possessed the following knowledge with regard to the transaction imputed to Flagstar as their principal:

    a.    Plaintiff's lease was not with the titled owner, Palka, but with Demarco, indicating therefore that the transfer of title was not real, but merely a conditional temporary transfer of title;

    b.    That plaintiff had an option to repurchase the property from Palka based on the option document in their closing file signed by plaintiff;

    c.    That plaintiff intended to continue occupancy of the property based on plaintiff's lease in their closing file;

    d.    That the purchase process was irregular insofar as Palka did not intend to purchase or occupy plaintiff's home at all and was merely a straw purchaser for Demarco (as indicated by Demarco being listed as landlord in plaintiff's lease) and that the down money was not Palka's, but rather to be reimbursed to Demarco after closing);

    e.    Plaintiff was in financial distress based on the "Seller's Acknowledgment" addendum to the sale agreement ¶6 indicating that circumstances dictate "immediate sale" of the subject property and that otherwise all of the dozens of loans closed by Miller and for Demarco involve distressed homeowners the majority of whom are in foreclosure on their mortgages;

84.     Flagstar possessed the following actual or constructive knowledge with regard to the transaction:

    a.    That plaintiff was not represented by legal counsel during the sale transaction;

    b.    That the sale process was irregular as set forth above.

## V.     Causes of Action

### COUNT I – Equitable Relief

*Plaintiff v. Flagstar*

85.     Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

86.     The deed and mortgage are *void ab initio* having not been validly notarized by defendant Feltman pursuant to state law, N.J. Rev. Stat. § 17:11C-1 *et seq.*

87.     Plaintiff is entitled to equitable reformation of the deed returning title to her and also entitled to equitable reformation of the mortgage loan with a reduced principal recognizing only benefit of debts satisfied and affordable monthly payment terms.

88.     In the alternative or additionally, the disputed sale/loan transaction was irregular based on, but not limited to, the following facts:

    a.    Plaintiff's lease was not with the titled owner, Palka, but with Demarco, indicating therefore that the transfer of title was not real and that plaintiff would functionally continue as homeowner under a conditional, temporary transfer of title;

    b.    Plaintiff had an option to repurchase document constructively known to Flagstar by the presence of the option document in its closing agent 's closing file;

14

c.     Plaintiff would continue in possession of the property after sale constructively known to Flagstar by the presence of the lease document in its closing agent 's closing file;

d.     Plaintiff would continue duties of a homeowner by, in addition to upkeep duties as to the property, would pay the mortgage payments to Flagstar via lease payments to Demarco;

e.     By the absence of legal fees on the HUD-1, Flagstar would have had no notice that plaintiff was represented by legal counsel at the closing;

f.     The purchase process was highly irregular in that:

   i.   Palka's application for the loan changed from primary to second home purchase with indications of possible investment property status after initial denial of the application within the span of only one (1) month without any inquiry by Flagstar;

   ii.  Palka buying a second home sixty (60) miles away in a New Jersey suburban neighborhood nearly identical to her own in Pennsylvania without access to vacation amenities or other known reason to justify second home status;

   iii. There was no prior listing of the property or involvement of a real estate agent in the sale;

g.     Plaintiff's existing mortgage loan was delinquent and in foreclosure status at the time of the disputed loan's origination.

89.   The aforesaid facts gave Flagstar notice or the principals of equity alone create a deed equitably vested back in plaintiff and an equitable mortgage in favor of Flagstar only as

15

benefit recognized by plaintiff from the transaction.

90.     The Flagstar mortgage is, in fact, plaintiff's refinance mortgage and Plaintiff is the implied borrower of Palka's purchase loan made by Flagstar brokered through Bronfman and DeMarco wherein the loan refinanced and paid off Plaintiff's debt, but plaintiff retained all indicia of homeownership, and Plaintiff funded by her equity Defendants' disbursement of the loan/sale proceeds.

## <u>COUNT II</u>
**Truth-in-Lending Act ("TILA")/Home Ownership and Equity Protection Act ("HOEPA")**
*Plaintiff v. Flagstar*

91.     Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

92.     Plaintiff is a natural person provided with the right to defer payment of debts or to incur payment of debt and defer payment, and the credit offered or extended was primarily for personal, family and/or household purposes.

93.     Defendant regularly extend consumer credit, six (6) or more loans per year, two (2) or more high cost mortgages per year, and/or one (1) or more of such high cost mortgages through a broker.

94.     This loan was a federally related mortgage loan, made by a federally-insured depository lender, is HUD-related, and/or was intended to be sold on the secondary market or to creditors who make or invest more than one million dollars a year in residentially secured loans.

95.     At all times material, Defendant, in the ordinary course of business, extended and/or arranged for the extension of consumer credit and/or offered to extend or arrange for the extension of such credit.

16

96.     The Loan was a residential refinance mortgage loan subject to Plaintiff's right of rescission, recoupment,  statutory and/or actual damages described by 15 U.S.C. §1635 and 12 C.F.R. §226.23.

97.     In said loan transaction, Plaintiff did not receive the disclosures required by the Truth-In-Lending Act ("TILA"), 15 U.S.C.  §1601, et. seq., and Regulation Z of the Federal Reserve Board ("Regulation Z"), 12 C.F.R §226.1 et seq.

98.     Defendant Flagstar knew or should have known Plaintiff to be an implied-in-fact borrower.

99.     Defendants failed to deliver all "material" disclosures required by TILA and Regulation Z, including but not limited to:

> (a) Failing to properly and accurately disclose the "amount financed," described in and in violation of Regulation Z §226.18(b) and 15 U.S.C. §1638(a)(2)(A);
>
> (b) Failing to clearly and accurately disclose the "finance charge," described in and in violation of Regulation Z §226.4 and 15 U.S.C. §1638(a)(3);
>
> (c) Failing to clearly and accurately disclose the "annual percentage rate," described in and in violation of Regular Z §226.18(e) and 15 U.S.C. §1638(a)(4);
>
> (d) Failing to comply with the special disclosure requirements of Regulation Z §226.32;
>
> (e) Failing to timely provide Plaintiff with two (2) copies of a Notice of her Right to Rescind the Transaction and/or one (1) copy each of the form Disclosure pursuant to TILA and/or HOEPA.

100.    Due to the violations of TILA and Regulation Z, Plaintiff has an ongoing right to rescind the transaction, and for attorney's fees.

101.    Plaintiff either has previously rescinded the loan greater than twenty days prior to the filing of this complaint and Defendant has taken no action to rescind the loan in contravention of its responsibilities under TILA, or, to the extent this Honorable Court may find that Plaintiff has not already rescinded the loan, Plaintiff does hereby exercise her right to rescind same and this Complaint shall hereby constitute Plaintiff's Notice of Rescission pursuant to TILA, 15 U.S.C. §1601, et seq.

### COUNT III
### New Jersey Consumer Fraud Act (CFA)
*Defendants Demarco, Feltman, and Title Defendants*

102.    Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

103.    Title defendants misrepresented to plaintiff by the HUD1 for the loan that the transaction between plaintiff and Palka was a straightforward sale of real estate when, in fact, title defendants' closing file was replete with documentation described herein, including a lease, option to purchase in favor of plaintiff and other documents which indicated it was a sale lease back transaction wherein Demarco would be plaintiff's landlord and Palka would not occupy the home nor take any real ownership interest.

104.    Title defendants misrepresented to plaintiff by the HUD1 that the sale proceeds representing her home equity would be paid to her when, in fact, title defendants' closing file reflected a one page document reflecting that Demarco would be paid $85,000 for unspecified financial services.

105.    Having closed dozens of Demarco transactions prior to Rizzo's transaction all involving homeowners in foreclosure proceedings, Title defendants knew that Demarco's fee for financial services was not real due to its corresponding only to the amount of home equity

18

remaining after payment of any existing liens, judgments, loan settlement charges, and disbursements to homeowners.

106. Title defendants, particularly defendant Powers being a partner in a foreclosure law firm with decades of legal experience and sole owner of two (2) title agencies, knew that Demarco's "fee" for services was nothing more than a strip of the remaining home equity from a Demarco homeowner client like Ms. Rizzo.

107. Because of this aforesaid knowledge, Title defendants knew that the Rizzo/Palka "sale" transaction, like the dozens of other foreclosure rescue transactions they were structuring and/or participating in, was destined to fail in that, with all of the home equity taken from the transaction, plaintiff could not hope to finance the repurchase of the home with a foreclosure damaging her credit.

108. Title defendants' assurance to Demarco of its refusal to provide Plaintiff with closing documentation had no grounds in law and manifested Title defendants' intent to conceal Demarco's conversion of plaintiff's deed, equity and sale proceeds.

109. Defendant Feltman, by her actions described herein engaged in unconscionable commercial practices, deception, fraud including but not limited her misrepresentation to all parties to the transaction that the notarization of the deed and mortgage documents was legal, when, in fact, it was illegal.

110. Feltman, knowingly assisting Demarco's operation by a knowing illegal act, intended plaintiff to rely upon the legality of her actions and plaintiff did so rely to her detriment upon the representations of Feltman's co-conspirators, Joe and Mike, that plaintiff would not lose title to her property.

111.     Demarco directed, instructed and otherwise involved all of the aforesaid defendants in his foreclosure rescue scheme described herein with the purpose of stealing the home equity from the home of plaintiff and one hundred nineteen other New Jersey and Pennsylvania homeowners similarly situated.

112.     Said Defendants intended for plaintiff to rely on the defendants' aforementioned acts creating the appearance of a lawful real estate and loan transaction when such acts in fact involved unconscionable commercial practices, deception, fraud, false pretense, false promise and misrepresentation, and plaintiff did rely on same.

113.     The foregoing acts by Defendants constitute unconscionable commercial practices, deception, fraud, false pretense, false promises, misrepresentations, and/or the knowing, concealment, or omission of material facts in violation of the Consumer Fraud Act, N.J.S.A. 56:8-2 *et seq.* which caused plaintiff to suffer ascertainable loss of over $100,000 in stolen loan funds.

## COUNT IV – PROFESSIONAL NEGLIGENCE
### (Closing Attorney)

114.     Plaintiff repeats the above allegations as if set forth herein at length.

115.     Closing Attorney owed a duty of care to plaintiff.

116.     As part of the closing scheduled in connection with the real estate sale set forth in this complaint, Closing Attorney was employed to prepare a deed of conveyance from Plaintiff and a HUD-1 for the transaction as set forth above.

117.     Such employment was not at the written request of the Plaintiff.

118.     DeMarco directed the service of deed preparation to Closing Attorney.

119.    By preparing a deed for the plaintiff as seller, Closing Attorney was representing the Plaintiff in connection with the transaction.

120.    By accepting the task of preparing the deeds, Closing Attorney was obligated to represent the interests of his client, the plaintiff seller in the transaction, in the same manner as he is required to represent the interests of other clients.

121.    Despite the fact that Closing Attorney was obligated to represent and protect the interests of the Plaintiff, defendant failed to do so.

122.    Neither Closing Attorney nor any agent, servant, or representative of his including, but not limited to Miller, ever contacted or personally consulted with the Plaintiff concerning the real estate transaction nor provided any disclosure to Plaintiff concerning Powers' connection to or employment with Demarco or Demarco REI.

123.    The employment of Closing Attorney as well as Closing Attorney's relationship with DeMarco and DeMarco REI placed Closing Attorney in an untenable conflict of interest, by virtue of which Closing Attorney could not ethically or professionally represent the Plaintiff's interests as Seller.

124.    Indeed, Closing Attorney was simultaneously serving two masters, i.e. the Plaintiff and DeMarco/DeMarco REI, with wholly divergent and different goals.

125.    DeMarco's goal was to conceal his theft of seller's funds due plaintiff on the HUD1 closing statement and other documents while the goal of the Plaintiff was to ensure that her rights were protected in the real estate closing, even if that meant that the closing should not go forward at all.

126.    Plaintiff's rights were not protected.

21

127.   By having an interest in collecting his fees paid from the transaction, Closing Attorney had an incentive to ensure the deal closing rather than act in the Plaintiff's best interests as seller.

128.   Plaintiff was deprived of any consultation whatsoever concerning her rights, responsibilities and liabilities concerning the entire transaction, despite Closing Attorney's representation of her interests.

129.   The dual responsibilities of Closing Attorney constituted a breach of his duty of loyalty to the Plaintiff as her attorney.

130.   Closing Attorney had a duty to place the client's best interests first and to provide the client with independent professional judgment.

131.   Closing Attorney breached that duty by putting the interests of DeMarco and DeMarco REI ahead of plaintiff's interests by, among other things;

    a.   Creating documents to make it appear that Plaintiff was selling her home when he knew or should have known that DeMarco had represented that the transaction was a kind of mortgage that would enable Plaintiff to save her home;

    b.   Failing to provide Plaintiff with sound legal advice about the significance of transferring the deed to her property to someone else;

    c.   Failing to explain the risks and dangers associated with the transaction;

    d.   Preparing and witnessing a settlement statement that contained false statement including but not limited to the existence of a substantial down payment and the disbursement of sale proceeds to seller which defendant knew was being disbursed by him to DeMarco;

    e.   Failing to supervise the disbursement of funds from the loan closing;

22

f.   Filing documents such as the deed and mortgage with the Plaintiff's signature forged thereto; and

g.   Obscuring the nature of the loan transaction that they closed by, among, other acts, lying about Demarco's fees being paid for actual services rendered to plaintiff.

132.   As a result of Defendant's breach of their duty, Plaintiff suffered damage.

### COUNT V - Breach of Contract
*Closing Attorney*

133.   Plaintiff repeats the above allegations as if set forth herein at length.

134.   Plaintiff and Defendant Powers entered into a contract, for legal services which is either implied or in the exclusive possession of Closing Attorney.

135.   Plaintiff and Defendant, Closing Attorney, executed a fee agreement and/or entered into a mutual understanding, express or implied, or as a matter of law, towards Defendants' representation of Plaintiff in the underlying sale transaction.

136.   Whether express, implied, or as a matter of law, Defendant Powers breached that agreement/understanding as aforesaid (incorporated by reference).

137.   As a direct and proximate cause of the aforementioned breach of the agreement to provide legal services, Plaintiff has been damaged, as set forth above.

### COUNT VI - Breach of Fiduciary Duty
*Closing Attorney*

138.   Plaintiff repeats the above allegations as if set forth herein at length.

139.   Plaintiff and Defendant were in a fiduciary, attorney-client relationship.

140.   Defendants' aforementioned conduct constitutes a breach of that fiduciary relationship.

141.   As a direct and proximate cause of the aforementioned breach of fiduciary duty, Plaintiff has been damaged (as set forth above).

## VI.   Prayer for Relief

**WHEREFORE**, Plaintiff requests this Honorable Court enter judgment in her favor and against Defendants, individually, jointly and/or severally, in an amount in excess of seventy-five thousand dollars ($75,000), plus such other and further relief as this Honorable Court deems necessary and just, and to Order the following relief:

    a.  Termination of any security interest in Plaintiff's property which may have been created under the loan in favor of Palka;

    b.  Equitable reformation of the Flagstar loan obligation;
    c.  Return of any money or property given by Plaintiff to anyone, including Defendants, in connection with the transaction;

    d.  Statutory damages;

    e.  Forfeiture and return of loan proceeds representing cashed out home equity stolen from plaintiff;

    f.  Damages, including;
       i.  Actual damages;
      ii.  Treble damages;
     iii.  Attorneys fees and expenses, and costs of suit; and
     iv.  Punitive Damages.

               WEISBERG LAW, P.C.

               /s/ Matthew B. Weisberg        
               MATTHEW B. WEISBERG, ESQUIRE
               Attorney for Plaintiff

Dated: 1/20/12